UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| RICKY WILCOX | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 7-27-B-W |
| | ) |
| TOWN OF PITTSFIELD, et al., | ) |
| | ) |
| Defendants | ) |

**RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT**

Ricky Wilcox filed this action against the Town of Pittsfield, Chief of Police Steven Emery, and Officer Jason Emery complaining about Officer Emery's February 2005 search of his residence, arrest, use of force, and defamation of Wilcox. In his response to this motion for summary judgment filed by the defendants (Docket No. 9), Wilcox summarizes his theory of recovery:

> The Plaintiff's claims arise out of a search of his residence, his false arrest for the alleged crime of aggravated drug trafficking based on seven grams of marijuana, a wrist injury that occurred while being yanked out of the cruiser by Defendant Jason Emery and the defamation to his character by Defendant Jason Emery in a newspaper article based on an interview Defendant Jason Emery gave, wrongfully asserting that the Plaintiff was trading drugs for sex with teenage girls. Plaintiff's complaint alleges violations of the Fourth, Fifth and Fourteenth Amendments brought under 42 U.S.C. §1983.

(Mem. Opp'n Mot. Summ. J. at 11.)[1] I now recommend the court grant the defendants' motion for summary judgment.

---

[1] This conceptualization of the action is rather revisionist as the complaint clearly contained counts brought pursuant to the Maine Tort Claims Act. (See Compl. ¶¶ 40 (defamation count);id. ¶ 50 (assault count).) In their reply memorandum, the defendants do not address Wilcox's characterization of his claims; the reply is limited to an argument that, while Wilcox timely filed his opposition memorandum, he was late in filing his statement of facts. (Reply Mem. at 1-3.) However, Wilcox's attorney did file a letter explaining that technical problems prevented him from finishing the filing process at the time that his memorandum was filed and includes copies of notifications he received from the court's electronic filing system documenting his difficulties. (Docket No. 22.)

*Discussion*

### A. Summary Judgment Standard

"At the summary judgment stage," the United States Supreme Court explained in <u>Scott v. Harris</u>, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." __ U.S. __, __, 127 S. Ct. 1769, 1776 (2007) (citing Fed. Rule Civ. Proc. 56(c)).  <u>Scott</u> reemphasized, "'[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."'" <u>Id.</u> (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-587 (1986)). "'[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.'" <u>Id.</u> (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-248 (1986)).  Wilcox cannot defeat summary judgment by relying on "'conclusory allegations, or rank speculation.'"  <u>Mariani-Colon v. Dep't of Homeland Sec.</u>, 511 F.3d 216, 224 (1st Cir. 2007) (quoting <u>Fontánez-Núñez v. Janssen Ortho LLC</u>, 447 F.3d 50, 55 (1st Cir. 2006)).

---

I am going to address Wilcox's claims based on his clear request in his memorandum that I treat his substantive claims as brought under the United States Constitution through the 42 U.S.C. § 1983 vehicle.  As presented in the summary judgment pleadings,  the negligent infliction of emotional distress 'count' and the malice 'count' are plainly meant as a means of proving injury and damages stemming from the constitutional wrongs.

That said, Wilcox has made the nature of his claims a moving target.  In an attempt to make this recommended disposition as helpful as possible, when discussing his defamation claim I do address his perfunctory alternative argument that he has a claim under the Maine Tort Claims Act and, although not at all discussed in his memorandum, I pay some attention to the question of whether or not he has created a genuine dispute of material fact vis-à-vis a Fourth Amendment excessive force claim.

In a similar vein, in the recitation of facts set forth below there are facts included that are material to possible claims by Wilcox that have in no way been defended by Wilcox in responding to the motion for summary judgment.

**B.  Material Facts**

### 1.  Training and supervision of Officer Emery

At all times relevant to this action, Steven Emery was employed by the Town of Pittsfield as the Chief of Police of the Pittsfield Police Department.   (SMF ¶ 1; Resp. SMF ¶ 1.)  Chief Emery is a graduate of the Maine Criminal Justice Academy and in February 2005 was certified by the State of Maine to function as a Chief of Police for the Town of Pittsfield. (SMF ¶ 2; Resp. SMF ¶ 2.)  At all times relevant, Jason Emery was employed as a part time police officer with the Pittsfield Police Department. (SMF ¶ 3; Resp. SMF ¶ 3.)  Officer Emery is a graduate of the Maine Criminal Justice Academy's 100 hour reserve law enforcement officer's course and in February 2005 he was certified by the State of Maine to function as a law enforcement officer for the Town of Pittsfield. (SMF ¶ 4; Resp. SMF ¶ 4.) Before any new police officer hired by the Town of Pittsfield is allowed to patrol on his/her own, he/she must first graduate from the Maine Criminal Justice Academy, be certified by the State of Maine to perform the duties assigned to that officer, and then complete a field training program with the Pittsfield Police Department after graduation. (SMF ¶ 5; Resp. SMF ¶ 5.)   The field training program is overseen by supervisory personnel at the Pittsfield Police Department and includes reviews of the officer's performance by those supervisors. (SMF ¶ 6; Emery Aff. ¶ 2.)[2] A full-time Pittsfield police officer oversees all the new officer's activities as a patrol officer during the field training period and it is only after the field training program is successfully completed that a newly-hired officer may work patrol duties on his own. (SMF ¶ 7; Resp. SMF ¶ 7.)

---

[2]      Wilcox notes that Police Chief Emery stated in his deposition that he was not sure if a field training officer had worked with Jason Emery.  (Resp. SMF ¶ 6; S. Emery Dep. at 11.)

According to the defendants, Officer Jason L. Emery completed the field training program at the Pittsfield Police Department prior to February 2005.  (SMF ¶ 8; S. Emery Aff. ¶ 3.)  Wilcox denies this statement by citing to Jason Emery's deposition testimony that when he got hired to work for Pittsfield he did not have a field training officer work with him.  (Resp. SMF ¶ 8; J. Emery Dep. at 30.)  Wilcox further asserts that Officer Emery received no training in establishing probable cause to support an affidavit for a search warrant. (SMAF ¶ 115; J. Emery Dep. at 31 - 32.)  The defendants counter that Jason Emery testified that he had not had training in filling out an affidavit or a form for requesting a search warrant not that he had not had training in establishing probable cause to support a request for a warrant.  ( Resp. SAMF ¶ 115; J. Emery Dep. at 30; J. Emery Aff. ¶ 9.)

Chief Emery is familiar with policies and procedures concerning arrest powers and the use of force in connection with arrests and the training given to Pittsfield police officers in these areas. (SMF  ¶ 9; Resp. SMF ¶ 9.)    At both the Maine Criminal Justice Academy and through in-house training at the Pittsfield Police Department, Officer Jason Emery received training on arrest powers, the lawful use of force in connection with arrests, and in the laws governing the application for, and execution of, search warrants. (SMF  ¶ 10; Resp. SMF ¶ 10.)   Prior to February 19, 2005, Chief Steven Emery was not aware of any problems regarding Officer Emery's knowledge of Maine's laws governing arrest and/or the use of force. (SMF  ¶ 11; Resp. SMF ¶ 11.)   Prior to February 2005, Chief Emery had not received any credible information that Officer Emery unlawfully exercised his arrest powers or needlessly used force against arrestees, or that he required additional training and/or supervision in those areas. (SMF  ¶ 12; Resp. SMF ¶ 12.)    There also was no credible information indicating that there was any widespread problem involving other officers employed by the Pittsfield Police Department

regarding the areas of arrest or the use of lawful force in connection with an arrest. (SMF ¶ 13; Resp. SMF ¶ 13.)

Coverage for Pittsfield and its police officers for liability arising out of their law enforcement duties is provided by the town's membership in the Maine Municipal Association Property & Casualty Pool, a self-insured municipal risk pool. (SMF ¶ 14; Resp. SMF ¶ 14.) Under the pool agreement, coverage for claims arising under state law is only available for conduct for which there is no immunity under state law and this is the only liability coverage available to the defendants in the above referenced matter. (SMF ¶ 15; Resp. SMF ¶ 15.)

**2.** **_The investigation into Wilcox's activities, the search, the arrest, and resolution_**

In January 2005 Chief Emery was given some photographs of Ricky Wilcox, another individual known to the Chief Emery as Johnny Haskell, Jr., and several teenage females. (SMF ¶ 16; Resp. SMF ¶ 16.)   The pictures showed Haskell and the teenage girls apparently using alcohol and, according to the defendants, smoking marijuana from a pipe. (SMF ¶ 17;  S. Emery Aff. ¶ 4;  J. Emery Aff. ¶ 4.) Wilcox notes that Officer Jason Emery admitted at his deposition that the photograph did not reveal what they were smoking.  (Resp. SMF ¶ 17; J. Emery Dep. at 56.)  Wilcox concedes that two photographs were taken in his basement.  (SMF ¶ 18; Wilcox Dep. at 18; Resp. SMF ¶ 18.)[3]

Chief Emery was given the photographs by the mother of one of the girls who appeared in the photos. (SMF ¶ 19; Resp. SMF ¶ 19.) The mother expressed concern about the apparent drug and alcohol use her daughter was engaging in while in the company of Ricky Wilcox and Johnny Haskell. (SMF ¶ 20; Resp. SMF ¶ 20.)  Chief Emery showed the

---

[3]        Wilcox points out that he testified that some of the pictures at issue were taken elsewhere.  (Resp. SMF ¶ 18; Wilcox Dep. at 16, 19.)

photographs to all Pittsfield police officers so they were aware of this activity and to see whether they could identify the individuals in the photographs.  (SMF ¶ 21; Resp. SMF ¶ 21.)  In January 2005, Chief Emery gave these photographs to Officer Jason Emery. (SMF ¶ 22; Resp. SMF ¶ 22.)  Chief Emery advised Officer Emery that he had been given the photographs by the mother of one of the teenage girls who appears in them. (SMF ¶ 23; Resp. SMF ¶ 23.)

In 2001, Officer Emery had been involved in the execution of a search warrant at another residence which resulted in Johnny Haskell, Jr., one of the males seen in the photos, being charged with aggravated trafficking in marijuana. (SMF ¶ 24; Resp. SMF ¶ 24.) In one of the photographs taken at the Wilcox residence, Haskell is shown wearing a yellow "Gap Athletic" shirt, holding a marijuana pipe in his hand and with a plate containing a white powdery substance in front of him, with Ricky Wilcox seated on a bucket next to him.  (SMF ¶ 25; J. Emery Aff. ¶ 4 & Exs. 2-6.)   Wilcox denies this statement by asserting, through a record citation: "Several of the photographs in the possession of the police show young people in the basement of Johnny Haskell Jr.'s home, not in the home of Diane and Ricky Wilcox." (Resp. SMF ¶ 25; Almeida Aff. ¶ 10.)   The bottom line is that there is no dispute that Wilcox appears in the picture.

According to the defendants, on January 22, 2005, Officer Rodney Minoty of the Pittsfield Police Department spoke with an 18-year-old female who appeared in the photographs and she related that "partying" occurred nearly every night at the residence of Ricky Wilcox and that young females would go there for drugs and sex. (SMF ¶ 26;  J. Emery Aff. ¶ 6.) This same female also indicated that Wilcox kept marijuana, prescription drugs, and occasionally cocaine in a filing cabinet in the basement where the parties normally occurred, and the photographs were taken at a residence on Davis Street in Pittsfield.  (SMF ¶ 27; J. Emery ¶ 6.) Officer Emery

believed that the information that had been given to Officer Minoty by this female confirmed what the photographs themselves appeared to depict:  that is, teenage girls using drugs and alcohol in the basement of the Wilcox residence on Davis Street. (SMF ¶ 28; J. Emery ¶ 6.)

Wilcox denies these three paragraphs.  His <u>record</u> support[4] for these denials is the affidavit statement of Jessica Ames Almeida:  "A third photograph shows me and Amanda Wentworth sitting on a couch with Johnny Haskell, Jr. That photograph was taken in Johnny Haskell Jr's. home. It has nothing to do with Mr. Wilcox."  (Resp. SMF ¶ 26; Almeida Aff. ¶ 16.)

There is no genuine (or non-genuine) dispute that on January 22, 2005, Officer Emery received information from Maine State Trooper Chris Carr, who indicated that a confidential informant familiar with Ricky Wilcox had confirmed that Wilcox was a drug user who also sold drugs from his Davis Street residence, and that he had served time in federal prison for dealing drugs.  (SMF ¶ 29; Resp. SMF ¶ 29.)  Wilcox was convicted in 1992 in federal court in Pennsylvania of knowingly, willingly, and intentionally distributing marijuana. (SMF ¶ 30; Resp. SMF ¶ 30.) On February 9, 2005, Officer Emery reviewed a report prepared by Detective Hooper of the Fairfield Police Department stating that an informant had advised him that one of the informant's employees purchased marijuana daily from Wilcox and that Wilcox normally had a

---

[4]   The actual text for the denial of  Paragraph 26 reads:

> Deny. Jessica Ames Almeida was told by Amanda Wentworth that Officer Rodney Minoty had approached her and threatened her and demanded that she write a statement because the police needed people to corroborate their position and cooperate with them in their ongoing investigation against Ricky Wilcox. He said to her that they had dirt on her and he could arrest her right then if he wanted to. Amanda Wentworth is one of the women in the photographs which the Defendant has used as Exhibits. See Affidavit of Jessica Ames Almeida ¶16. Please also see Deposition of Jason Emery, Page 52, Lines 23-25 and Page 53, Lines 1-6.

(Resp. SMF ¶ 26.)

> Deny. See Affidavit of Ricky Wilcox ¶8, 60, and 63. (He never kept marijuana and cocaine in his residence except for small quantities of marijuana for personal use.)

(Resp. SMF ¶ 27.)

> Deny. See Deposition of Jason Emery, Page 52, Lines 23-25 and Page 53, Lines 1-5.

(Resp. SMF ¶ 28.)

pound of marijuana in his residence at any given time. (SMF ¶ 31; Resp. SMF ¶ 31.)  According to the report, the informant also advised Detective Hooper that Ricky Wilcox had Oxycontin for sale and also was able to get cocaine. (SMF ¶ 32; Resp. SMF ¶ 32.) The informant also advised Detective Hooper that his employee had purchased marijuana from Wilcox the previous night and that when the informant was at the residence there were three other unknown males there buying marijuana from Wilcox. (SMF ¶ 33; Resp. SMF ¶ 33.)  Detective Hooper's informant also reported that Wilcox had spent time in prison for drug trafficking. (SMF ¶ 34; Resp. SMF ¶ 34.) Wilcox concedes the truth of the allegation that he spent time in prison for drug trafficking. (SMF ¶ 35; Resp. SMF ¶ 35.)   On February 9, 2005, Officer Emery conducted a so-called "Triple I" check on Ricky Wilcox which showed that Wilcox had spent time in federal prison after his conviction in the State of Pennsylvania for distribution of marijuana. (SMF ¶ 36; Resp. SMF ¶ 36.)

On February 12, 2005, Officer Emery observed an individual named Curtis Booth enter the residence of Ricky Wilcox and leave the residence after approximately ten minutes inside. (SMF ¶ 37; Resp. SMF ¶ 37.)  Officer Emery observed Booth enter and leave the Wilcox residence in this manner twice within one hour while Officer Emery was observing the residence. (SMF ¶ 38; Resp. SMF ¶ 38.)   Wilcox does not dispute that Curtis Booth came inside his house and departed after a brief stay twice on February 12, 2005. (SMF ¶ 39; Resp. SMF ¶ 39.)  According to the defendants Curtis Booth is known to Officer Emery as a drug user who was caught in possession of illegal hallucinogenic mushrooms when Officer Emery executed a search warrant in 2001.  (SMF ¶ 40;  J. Emery Aff. ¶ 8.)  Officer Emery's observations of Booth on February 12, 2005, were also consistent with drug-related activities occurring at the Wilcox residence.   (SMF ¶ 41; J. Emery; Aff. ¶ 8.)

8

The defendants maintain that on February 16, 2005, Officer Emery applied for a search warrant from the District Court, Somerset County, to enable him to search the premises of Ricky Wilcox at 19 Davis Street, Pittsfield. (SMF ¶ 42; J. Emery Aff. ¶ 2.)  Officer Emery applied for the search warrant because he believed that probable cause existed to believe Wilcox was distributing or furnishing drugs from his Davis Street residence based on the photographs, the information from informants, his own observations, and the known history of Ricky Wilcox and others with whom Wilcox was clearly associating.  (SMF ¶ 43;  J. Emery Aff.  ¶ 9.) Officer Emery requested a search warrant to search the Wilcox residence after information came to his attention that provided probable cause to believe that Ricky Wilcox was selling and/or furnishing drugs from his residence, including providing drugs to teenage girls who came to the residence to "party." (SMF ¶ 44; J. Emery Aff.  ¶¶ 4-9; S. Emery Aff. ¶ 4; see also Resp. SAMF ¶ 115.)

In response to the preceding five paragraphs – again without explaining the nature of the denial - Wilcox cites deposition pages and affidavits.  When asked at his deposition whether he was familiar with Curtis Booth, Chief Emery responded that he was, that Booth had grown up in Pittsfield, that Chief Emery had known him for years, and, to Chief Emery's knowledge, Booth was not a "known drug abuser."   (Resp. SMF ¶¶ 40, 41; S. Emery Dep. at 31-32.)  Wilcox also cites to three paragraphs from the affidavit of Jessica Ames Almeida in which she avers: "I know Curtis Booth as a man who lived across the street from Ricky and Diane Wilcox in Pittsfield" (Almeida Aff. ¶ 6); "He visited at the Wilcox home a few times while I was there." (id. ¶ 7); and, "He never did any drugs at the Wilcox home, nor did he ever purchase any drugs at the Wilcox home, to my knowledge."( id. ¶ 8).   He also cites to Jason Emery's deposition testimony when he indicates that the warrant was signed by a justice of the peace. (Resp. SMF ¶ 42; J. Emery Dep. at 33.)   Wilcox further relies on Officer Emery's testimony that he swore to the truth of the

9

statements made in his affidavit (SMF ¶ 43; J. Emery Dep. at 38) and that several representations in the warrant affidavit were broiler-plate (SMF ¶ 43; J. Emery Dep. at 38 -41).

Additionally, Wilcox relies on the following five paragraphs in his own affidavit: "Defendant Officer Jason Emery lied in his Affidavit when he said that he would find business records indicating that I was involved in the acquisition, sale, cultivation, possession, distribution, manufacture, processing, packaging, shipping, etc., of controlled drugs and other contraband." (R. Wilcox Aff. ¶ 20.) "Defendant Jason Emery lied in his Affidavit when he said he had probable cause to believe and did believe that sums of money obtained from the sale of drugs and contraband would be found in my residence." (Id. ¶ 21.) "Defendant Jason Emery lied in his Affidavit that he indicated that drug paraphernalia necessary to facilitate the possession, trafficking and furnishing of scheduled drugs would be found in my residence." (Id. ¶ 22.) "Defendant Officer Jason Emery lied in his Affidavit when he said that firearms, ammunitions, and explosive devices would be found in my residence." (Id. ¶ 23.) "I have never had firearms, ammunitions, or any explosive devices in my possession." (Id. ¶ 24.)  And, "I have never been involved in, nor did I have at any time in my residence materials involved in the possession, trafficking, and furnishing of scheduled drugs." (Id. ¶ 25.)

Wilcox cites to four affidavit statements made by Jessica Ames Almeida.  "Even at times when I was not living with the Wilcox, my friends, Cyreanne Emerson and Amanda Wentworth and I would frequently visit at their house to hang out."  (Almeida Aff. ¶3.)  "I never saw or heard of any drug dealing taking place at Ricky Wilcox' home."  (Id. ¶ 4.)  "The only young teenage women who hung out there were me and my two closest friends, Amanda Wentworth and Cyreanne Emerson." (Id. ¶ 20.)  And, "In fact, Ricky always preached at us that involvement

in drugs and alcohol was no way to live our lives." (Id. ¶ 21.)  Finally, Wilcox relies on his ex-wife's affidavit statement: "No partying ever went on in my home." (D. Wilcox Aff. ¶ 12.)

There is no dispute that in applying for the warrant, Officer Emery related all of the relevant information he had obtained in an affidavit in support of the application. (SMF ¶ 45; Resp. SMF ¶ 45.)  Prior to submitting the affidavit and request for a search a warrant to the District Court, Officer Emery had it reviewed by Assistant District Attorney James Mitchell. (SMF ¶ 46; Resp. SMF ¶ 46.)  The request for issuance of a search warrant was approved on February 16, 2005, the same day Officer Emery applied for it. (SMF ¶ 47; Resp. SMF ¶ 47.) Wilcox concedes that a search warrant was issued and Officer Emery had the right to enter and search his residence as a result. (SMF ¶ 48; Resp. SMF ¶ 48.) Wilcox never read the actual application for the search warrant, so he doesn't have any information about it. (SMF ¶ 49; Resp. SMF ¶ 49.)

On February 18, 2005, Officer Emery executed the search warrant that had been approved by the Justice of the Peace for the residence of Ricky Wilcox. (SMF ¶ 50; Resp. SMF ¶ 50.)  Chief Emery was also present in the Wilcox residence when the search warrant was executed on February 18, 2005. (SMF ¶ 51; Resp. SMF ¶ 51.) Chief Emery observed the seizure of marijuana, scales and baggies in the residence, all indications of drug trafficking occurring there. (SMF ¶ 52; Resp. SMF ¶ 52.) Wilcox concedes that the items seized, including a plastic bag with marijuana, boxes of baggies and two types of scales, belonged to him and were in his home when the search warrant was executed. (SMF ¶ 53; Resp. SMF ¶ 53.)  While the search located only a small amount of marijuana, Officer Emery found two sets of scales and boxes of plastic baggies, common items used in the sale and distribution of marijuana. (SMF ¶ 54; Resp. SMF ¶ 54.)  Officer Emery also found pipes and screens used to smoke marijuana, including the

brown pipe shown in the photographs being used by the teenage girls. (SMF ¶ 55; Resp. SMF ¶ 55.)  Officer Emery also found a prescription bottle for 100 tablets of Percocet that had been filled for Ricky Wilcox on February 6, 2005, to be taken by Wilcox four times per day. (SMF ¶ 56; Resp. SMF ¶ 56.)  According to defendants, the Percocet bottle was empty despite the fact that only 12 days had passed since the prescription for 100 Percocet tablets had been filled. (SMF ¶ 57; J. Emery Aff. ¶ 10.) According to Wilcox: "I keep two prescription bottles for my Percocet medication. One in which the prescription comes, and a smaller bottle which I carry every day." (Wilcox Aff. ¶ 57; Resp. SMF ¶ 57.)  There is no dispute that Ricky Wilcox was not present at his residence when the search warrant was executed.  (SMF ¶ 58; Resp. SMF ¶ 58.)

According to the defendants, Officer Emery spoke with Wilcox's wife who, while denying any specific knowledge of drugs or drug activity in the residence, admitted that minor children and others were always coming into the house and either going downstairs or to a back room that was being renovated. (SMF ¶ 59; J. Emery Aff. ¶ 11.)  Wilcox denies this fact by citing the affidavit statements of Diane Wilcox as follows: "At various times between December 2004 and March 2005, Jessica Ames Almeida lived in our home." (D. Wilcox Aff. ¶ 4);  "Jessica and several of her friends, Cyreanne Emerson, Amanda Wentworth, and Johnny Haskell, Jr., frequently came to our home to hang out and talk to my then husband, Ricky Wilcox."  (Id. ¶ 5.) "The young people would go down in the basement to smoke cigarettes."  (Id. ¶ 6.)[5]

On the date the search warrant was executed, a teenage girl was also present, and she claimed that two of the marijuana pipes seized belonged to her, saying that she had brought them to the Wilcox residence for the first time the previous night.  (SMF ¶ 60; Resp. SMF ¶ 60.) According to the defendants, the photographs that had been given to Chief Emery weeks earlier,

---

[5]       I guess that the dispute that the plaintiff thinks is material is whether or not there was renovation going on?

however, showed those same pipes being used in the basement of the Wilcox residence at that time. (SMF ¶ 61; J. Emery Aff. ¶ 11.) Wilcox <u>denies</u> this by citing two paragraphs from the affidavit of Jessica Ames which state: "In December of 2004 and January and February of 2005, I frequently lived at the home of Ricky and Diane Wilcox in Pittsfield, Maine" (Ames Aff. ¶ 1) and, "Another photograph shows me alone inhaling out of a pipe, which was mine. That photograph was taken in the basement of Ricky Wilcox' house" (<u>id.</u> ¶ 15).

There is no disagreement that Officer Emery advised Mrs. Wilcox to have her husband come to the Pittsfield police station to speak with him.  (SMF ¶ 62; Resp. SMF ¶ 62.) The following day, February 19, 2005, Ricky Wilcox came to the Pittsfield police station. (SMF ¶ 63; Resp. SMF ¶ 63.)   Wilcox denied dealing drugs from his house and/or supplying drugs to teenagers. (SMF ¶ 64; Resp. SMF ¶ 64.)  Regarding the teenagers, Wilcox said: "Those kids were messed up before they got to my house." (SMF ¶ 65; Resp. SMF ¶ 65.)  When Officer Emery asked Wilcox about the marijuana that had been found, Wilcox stated it was for his own personal use. (SMF ¶ 66; Resp. SMF ¶ 66.)  When Officer Emery questioned Wilcox about the scales that were seized, Wilcox only indicated that he used them to "keep people honest" and then declined to answer any further questions.  (SMF ¶ 67; Resp. SMF ¶ 67.)

According to the defendants, at that point, Officer Emery felt that probable cause existed to believe Wilcox had engaged in trafficking and/or furnishing drugs from his residence. (SMF ¶ 68; J. Emery Aff. ¶ 13.)  To <u>deny</u> this statement Wilcox cites to the deposition of Jason Emery in which the following exchange is reflected:

> Q:  Do you know what the indicia for probable cause is for a search warrant?
> A:  I do not understand your question.
> Q:  Um-hum. Do you know what you need to establish to demonstrate that you have probable cause for a search warrant?
> A:  What do I need to demonstrate that?

> Q: To establish probable cause.
> A: I try to go to the reliability of the information I have received.

(J. Emery Dep. at 32.)   This testimony does not address whether or not Officer Emery had grounds to believe that he had a sufficient legal basis to <u>arrest</u> Wilcox.

According to the defendants, because Wilcox's residence was within 1,000 feet of a school, the charge was raised to aggravated drug trafficking under state law.  (SMF ¶ 69;  J. Emery Aff. ¶ 13.)  Wilcox denies this statement with an unexplained citation to 17-A M.R.S.A. § 1105-A (which contains the within-1000-feet-of-the-school provision) and his Exhibit No. 5 which is a newspaper article which explains that the according to Jason Emery the charges were upgraded because the drugs were found within 1,000 feet of the school.

There is no dispute that Officer Emery advised Wilcox that he was under arrest, handcuffed him, and transported him to Somerset County Jail. (SMF ¶ 70; Resp. SMF ¶ 70.) According to the defendants, Officer Emery checked the handcuffs after placing them on Wilcox, and double-locked the cuffs so they would not tighten further.  (SMF ¶ 71; J. Emery Aff. ¶ 13.)  During the transport to the jail, Wilcox indicated several times that he was going to sue Officer Emery for obtaining the search warrant for his residence. (SMF ¶ 72; Resp. SMF ¶ 72.)   Once at the Somerset County Jail, Officer Emery was met by corrections officers who were to assume custody of Wilcox. (SMF ¶ 73; Resp. SMF ¶ 73.) When Officer Emery opened the door for Wilcox to exit his cruiser, Wilcox alleged that Officer Emery had hurt his arm and that he did not want any help to exit the vehicle.  (SMF ¶ 74;  J. Emery Aff. ¶ 13.) When they got inside the jail, Wilcox complained to the corrections officers about an injury to his right arm. (SMF ¶ 75; Resp. SMF ¶ 75.)  Wilcox had not resisted arrest and Officer Emery was aware of no reason that Wilcox could claim to be injured.  (SMF ¶ 76; J. Emery Aff. ¶ 13.)

14

There is no dispute that, because of jail policy, Wilcox had to be medically cleared before he could be incarcerated there.  (SMF ¶ 77; Resp. SMF ¶ 77.) Officer Emery then transported Wilcox to Redington-Fairview Hospital Emergency Room where he was x-rayed and medically cleared by the Emergency Room doctor to be returned to jail. (SMF ¶ 78; Resp. SMF ¶ 78.) Upon their return to the jail, Officer Emery released custody of Ricky Wilcox to the corrections officers. (SMF ¶ 79; Resp. SMF ¶ 79.)

According to the defendants, at no point did Officer Emery use any physical force against Ricky Wilcox other than the minimal amount of force necessary to take him into custody, including routine handcuffing and transporting him to the hospital and to jail and Wilcox first complained of an injury to his arm upon his arrival at the jail.  (SMF ¶¶ 80,81; J. Emery Aff. ¶ 14.)

Wilcox contravenes some of these paragraphs.  (Resp. SMF ¶¶ 71, 74, 76, 80, 81.)  In the cited deposition testimony, Wilcox tells the following version of events.   He says that at the time Jason Emery was filling out the summons, Wilcox challenged him to show him where all his proceeds were from his alleged trafficking.  The following are the lines of his deposition cited by Wilcox:

Q. What did he say in response to that?
A. He didn't say anything, he said put – get up and put your hands behind your back and that's when he arrested me.
 Q. Why don't you tell me about that, he handcuffs you?
A. Yeah, he told me to put my hands behind my back, get up and put my hands behind my back, and I said you're arresting me? And he said -- then he said it louder, get up and put your hands behind my back, and I said I just turned myself in, you're going to take me to jail. I said if I was such a threat to society that I needed to go the jail, why weren't you waiting for me last night. And then he put his hand on the butt of his gun and he said get up and put your hands behind your back. And I got  up and did that and he like crushed the cuffs on my wrists, and I mean he was squeezing so that his hand shook, and I said those are a little tight

aren't they, and he said I was under arrest, they were supposed to be tight. Then he led me to the car and put me in the back seat.

Q. You actually saw his hands shake?

 A. No, I felt his hands shake

Q. Okay. And you think that was because of the effort he was putting on to try to squeeze those cuffs on you?

A. Yes.

(The Deposition was in Recess.)

Q. I think we left off that you had been handcuffed and you were put in the cruiser by Officer Emery and you where taken to the Somerset County Jail, right?

A. Yes.

Q. And you went through the booking there and you paid some type of bail and were released, correct?

A. No.

Q. Why don't you tell me what I'm wrong about.

A. I was put in the car and on the way to Somerset County Jail, Jason made a statement that he  just wanted some cooperation, and I told him that I was under arrest, I said the conversation between he and I was over and that I'd see him in court and we could talk about it then. And shortly after that, he called John Ring who I guess is the bail commissioner or whatever that day, and he told John Ring that he was taking someone in and that he wanted their bail set at a thousand dollars. And I heard John ask him over the phone who it was, and he again stated that he wanted the bail set at a thousand dollars and it was a Saturday afternoon and I heard John say who the F is it, and he said Ricky Wilcox, and he says what's the charge, and he again said I want his bail set at a thousand dollars. And he goes what's the charge, and he said use of paraphernalia and aggravated trafficking, and he says I know this guy, he's got a wife and two kids, a house here in town, he's not going anywhere. He said a hundred dollars bail, and he goes no, I want his bail set at a thousand dollars. And he goes well, you don't set the bail around here, and he hung up the phone and continued on to the Somerset County Jail, and when we pulled into the sally port, he came around the car and opened the passenger side door and I stuck my foot out to get out and he grabbed me by the arm and yanked me out of the car, and I felt something pop in my wrist and I let out a yell because it hurt, and a female deputy came over and opened the door and she said what's going on. And he was pushing me towards the door and I said I think I just broke my wrist getting out of the car, and Jason said he's not hurt, he just don't want to go to jail. And he was standing behind me and he unlocked the cuffs and you could hear them spring off my wrist, and when I brought my right hand up, the female correctional officer gasped at what she saw because it was already black and the blood was coming right to the skin, and she asked me if I could move my fingers and I moved them a little and I said I can move them a little but it hurts like heck in clean words, and Jason Emery said that he's not hurt. They weren't that tight, he just don't want to go to jail. And she said something I can't say here and said you're taking him to the hospital  before you dump him here.

16

Q. Let me start because you can say anything here, we're all big kids, so what did she say?

A. She's like, fuck that, you're taking him to the hospital before you dump him here.

Q. All right. So did they take you to the hospital?

A. Yes.

Q. You were x-rayed at the hospital, right, Reddington Fairview?

A. Yes.

Q. And that showed that you didn't have a broken wrist, right?

A. He said that there was no fractures or breaks but I had ligament damage in my wrist, and he put a brace on me.

Q. So the emergency room doctor told you you had ligament damage based on just looking at your wrist with X rays showing you had no evidence of any fractures or breaks, right?

A. Correct.

Q. And they gave you a splint and told you you should use Ibuprofen, right?

A. Yes.

Q. You had reported a sudden snapping pain in your wrist as you got out of the cruiser, right?

A. As I got yanked out of the cruiser.

(R. Wilcox Dep. at 57-61.)

As to this alleged use of force, in his statement of additional fact Wilcox summarizes: "On February 19, 2005, when Ricky Wilcox confronted Defendant Officer Emery about his statements to Mrs. Wilcox, Defendant Emery became angry and placed the Plaintiff under arrest without probable cause."  (SAMF ¶ 111; R. Wilcox Aff. ¶¶ 2,5, 6.)  He further asserts that Officer Emery placed the handcuffs on Wilcox "intentionally extremely tight."  (SAMF ¶ 112; R. Wilcox Aff. ¶ 7.)   On arrival at the Somerset County Jail, Officer  Emery yanked Wilcox, out of the patrol vehicle with the intention of harming him.  (SAMF ¶ 113; R. Wilcox Aff. ¶ 11.)  Wilcox complained to the first corrections officer he encountered. ( SAMF ¶ 114; R. Wilcox Dep. at 59; Resp. SAMF ¶ 114.)

The defendants respond that Jason Emery did not get angry with Wilcox or arrest him without probable cause.  (Resp. SAMF ¶ 111; J. Emery Aff. ¶¶ 4-13; J. Emery Dep. at 74-76.)

They maintain that Jason Emery put the handcuffs on Wilcox as he was trained to do, checking to see if they were not too tight by placing two of his fingers inside them and double locking them so they would not tighten further.  (Resp. SAMF ¶ 112; J. Emery Aff. ¶ 13; J. Emery Dep. at 79-80.)   The defendants deny that Officer Emery yanked Wilcox out of the cruiser and insist that he did nothing intentionally to injure Wilcox.  (Resp. SAMF ¶ 113; J. Amery Aff. ¶ 13; J. Emery Dep. at 82.)

The Somerset County District Attorney subsequently dismissed the aggravated drug trafficking charge against Ricky Wilcox because no individuals who had purchased drugs from Wilcox were willing to testify against him.  (SMF ¶ 82; J. Emery Aff. ¶14.)  Wilcox counters: "The facts of Mr. Wilcox' arrest did not give rise to the charge of Aggravated Trafficking in Marijuana."  (Resp. SMF ¶ 82.)  He cites to 17-A M.R.S. § 1105-A and Wilcox's own affidavit paragraph:   "The fact that I have seven grams of marijuana did not support the crime of Aggravated Trafficking in marijuana and due to that, all my charges were dropped by the District Attorney."  (R. Wilcox Aff. ¶ 58.)

### 3.   *The Article*

Within a week after arresting Ricky Wilcox on February 19, 2005, Officer Emery was questioned by a reporter for the Bangor Daily News about Wilcox's arrest and the investigation of the charges against him.  (SMF ¶ 83; Resp. SMF ¶ 83.) Officer Emery recited to the reporter the statements he had made in the affidavit and application for a search warrant to respond to her questions concerning the nature of the activity which had led to Wilcox's arrest. (SMF ¶ 84; Resp. SMF ¶ 84.) Included in the information that Officer Emery related to the reporter was the report given to Officer Minoty by the 18-year-old female shown in the photographs that "young

females would go there [the Wilcox residence] for drugs and sex.  (SMF ¶ 85; Resp. SMF ¶ 85.)

According to the defendants, Officer Emery did not accuse Wilcox of having sex with these

teenage girls, as he had no information about the specific sexual activity that had taken place at

the parties at the Wilcox residence.  (SMF ¶ 86; J. Emery Aff. ¶ 15; see also Resp. SAMF ¶¶

109, 110; J. Emery Dep. at 72-74; J. Emery Aff. ¶ 11.)    There is no dispute that Officer Emery

also specifically advised the reporter that Wilcox had not been charged with any type of sex

crime. (SMF ¶ 87; Resp. SMF ¶ 87.)

Following Officer Emery's discussion with the reporter, a small article appeared in the

Bangor Daily News concerning his arrest of Ricky Wilcox.   (SMF ¶ 88; Resp. SMF ¶ 88.)

Wilcox concedes that this is the only article that has appeared in the newspaper about his arrest.

(SMF ¶ 89; Resp. SMF ¶ 89.)  This newspaper article is the defamation that Wilcox is alleging

against Officer Emery. (SMF ¶ 90; Resp. SMF ¶ 90.) A number of statements in the article are

attributed directly to Officer Emery, and he admits to having made those statements. (SMF ¶ 91;

Resp. SMF ¶ 91.)[6]

The first sentence of the article appears to be the reporter's summarization of her

understanding of the nature of the case against Wilcox, and not a statement attributed to Jason

Emery.  (SMF ¶ 93; J. Emery Aff. ¶ 15 & Ex. 8.) The information contained in that sentence,

indicating that Ricky Wilcox was charged with personally having sex with teenage girls at his

residence, was not information provided to the reporter by Officer Emery.  (SMF ¶ 94; J. Aff.  ¶

---

[6]      According to the defendants, all of the statements that are attributed to Officer Emery in the article are true.
(SMF ¶ 92; J.  Emery Aff.  ¶ 15; R. Wilcox Dep. at 72 -76.)  Wilcox returns:  "In the newspaper article which
appeared in the Bangor Daily News. There were six paragraphs. Paragraphs 2, 3, 5, and 6 were true at the time.
Paragraphs 1 and 4 were not true and are not true today." (Resp. SMF ¶ 92; R. Wilcox Aff. ¶ 59; see also SAMF
¶ 116; D. Wilcox Aff. ¶ 27.)  This exchange is conclusory tit for tat.

15.)  Wilcox agrees that the sentence indicating that Ricky Wilcox was charged with personally having sex with teenage girls at his residence is not in quotation marks or otherwise represented to be a representation made to the reporter by Officer Emery. (SMF ¶ 95; Resp. SMF ¶ 95.) Wilcox did not speak to the reporter to inquire as to what Officer Emery actually said. (SMF ¶ 96; Resp. SMF ¶ 96.)  According to the defendants, Wilcox does not know if the first paragraph of the article, which is not attributed to Officer Emery, is simply the reporter's paraphrasing of information that Officer Emery reported in his affidavit in support of the search warrant application.  (SMF ¶ 97;  Wilcox Dep. at 77.)   Officer Emery had included in the search warrant all the information he had about sexual activity involving the teenage girls which was provided to him by Officer Minoty.  (SMF ¶ 98; Resp. SMF ¶ 98.)   Officer Emery was aware, from a memo written by Officer Minoty, of allegations by one of the girls shown in the photographs that teenage girls went to the Wilcox residence for partying that included drugs and sex, however he had no more detailed information than that. (SMF ¶ 99; Resp. SMF ¶ 99.) The first sentence in the article merely reflects a misunderstanding by the reporter concerning the information that was in the affidavit supporting Officer Emery's request for a search warrant, and was not information supplied by Officer Emery. (SMF ¶ 100; J. Emery Aff. ¶ 15.)  The defendants insist that Officer Emery had no information that Wilcox personally had sex with the teenage girls, nor did he ever advise anyone else that he had such information or accuse Wilcox of such sexual activity.  (SMF ¶ 101; J. Emery Aff.  ¶ 15.)   Unlike the remainder of the newspaper article, that first sentence is not directly attributed to Officer Emery because Officer Emery never accused Ricky Wilcox of personal involvement in sexual activity with the teenage girls. (SMF ¶ 102; J. Emery Aff.  ¶ 15.)

20

Wilcox responds to certain of these paragraphs (Resp. SMF ¶¶ 86, 93, 94, 97, 100, 101, 102)  by citing to these three statements of Diane Wilcox's affidavit: "During that search, Officer Emery said to me words to the effect that 'If you knew what Ricky and his girlfriends were really doing, you would have nothing to do with him.'" (D. Wilcox Aff. ¶ 24);   "I asked him what he meant by that statement." (<u>id.</u> ¶ 25); and "Officer Jason Emery responded, 'He's giving these girls drugs for sex.'" (<u>id.</u> ¶ 26). He also points to three paragraphs of the Jessica Ames Almeida affidavit:  "During the search and in my presence he said to Diane Wilcox 'If you knew what Ricky and his girlfriends were really doing, you would have nothing to do with him.'" (Almeida Aff. ¶ 29);  "I heard Diane ask him what he meant by that." (<u>id.</u> ¶ 30); "Officer Jason Emery responded, 'Giving these little girls drugs for sex.'" (<u>id.</u> ¶ 31) (<u>See</u> <u>also</u> SMF ¶¶ 109, 110.).

### 4.    *Evidence of injury*

There is no dispute that Wilcox has not treated by any psychologists, psychiatrists, or counselors for any type of mental or emotional injuries he claims he received in these events in February of 2005.  (SMF ¶ 103; Resp. SMF ¶ 103.) Although Wilcox's complaint alleges he lost wages and earning capacity as a result of a right wrist injury, at the time of his arrest in February 2005, he was unemployed and had been unemployed since 2004. (SMF ¶ 104; Resp. SMF ¶ 104.) Wilcox was not only unemployed, he concedes that he was not employable at the time of his arrest in February of 2005. (SMF ¶ 105; Resp. SMF ¶ 105.) Wilcox became permanently and totally disabled as a result of a left arm injury in November of 2000. (SMF ¶ 106; Resp. SMF ¶ 106.)  X-rays taken at Redington-Fairview Hospital's emergency room on the day of Wilcox's arrest, showed no evidence of breaks or fractures in his right wrist, a finding confirmed by a bone scan performed three days later at Sebasticook Hospital. (SMF ¶ 107; Resp. SMF ¶ 107.)

Wilcox contends that his right wrist was injured when he was being taken from the cruiser in handcuffs upon arrival at the county jail.  (SMF ¶ 108; Resp. SMF ¶ 108.)

### C.  Wilcox's Claims

#### 1.  Fourth Amendment Search and Seizure Claim based on Officer Emery's Warrant

With regards to his "search and seizure" claim, Wilcox explains: "Plaintiff's causes of action stem from the unreasonable search of his residence which was predicated upon a search warrant based upon an Affidavit sworn to be the truth and yet, as we learned in Depositions, was not truthful." (Mem. Resp. Summ. J. at 12.)   The basis for this assertion is that Officer Jason Emery testified that much of his warrant affidavit was boilerplate. (Id.)  "Consequently," Wilcox opines, "the search warrant lacks constitutional validity."  (Id.)

The First Circuit's discussion in United States v. Khounsavanh  is a tutorial on this Fourth Amendment claim as framed by Wilcox:

> In many cases, as here, part of the basis for probable cause derives from information that the police have obtained from an informant. Prior to *Gates,* the Court had developed a two-pronged test for such a case: when the warrant affidavit rests on hearsay--an informant's report--the affidavit must inform the magistrate "of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were [the basis of knowledge prong], and some of the underlying circumstances from which the officer concluded that the informant ... was 'credible' or his information 'reliable' [the veracity prong]." Aguilar v. Texas, 378 U.S. 108, 114 (1964); Spinelli v. United States, 393 U.S. 410, 416 (1969). [Illinois v. ] Gates[, 462 U.S. 213 (1983)] abandoned the notion that "these elements should be understood as entirely separate and independent requirements to be rigidly exacted in every case" before a probable cause determination may be sustained. Gates, 462 U.S. at 230. Gates replaced the two-pronged framework of Aguilar and Spinelli with the totality of the circumstances test.[7]
>
>      ...

---

[7]      In support of this argument Wilcox cites to Aguilar and Spinelli (but not Gates) and four Massachusetts state court decisions.

The risk that the informant is lying or in error need not be wholly eliminated. Rather, what is needed is that "the probability of a lying or inaccurate informer has been sufficiently reduced by corroborative facts and observations." 2 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment 168 (3d ed. 1996) ("LaFave") (quotation omitted). The judgment to be made is: when does verification of part of the informant's story make it sufficiently likely that the crucial part of the informant's story (i.e., allegations that criminal activity has occurred and that evidence pertaining thereto will be found in the location to be searched) is true, such as would " 'warrant a [person] of reasonable caution in the belief' that [a search would be] appropriate," based upon what the informant has said? See Terry [v. Ohio], 392 U.S. [1,] 21-22 [(1968)].

113 F.3d 279, 283-85 (1st Cir. 1997) (footnote omitted); see also Gates, 462 U.S. at 238-39.

The affidavit in question begins with paragraphs A-F[8] which enumerate the types of property subject to seizure under the warrant. The affidavit then reads as follows:

1. In January 2005 Chief Emery advised your Affiant that he had spoken with a concerned citizen at the Pittsfield Police department. This concerned citizen stated and showed him a disk which contained pictures of Rick Wilcox, Johnny Haskell Jr. and several young females. Said pictures showed the group was using alcohol and smoking. One picture shows Haskell and Wilcox sitting on buckets with a plate with a white substance between the legs of Haskell.

2. On December 20, 2001, your Affiant executed a search warrant at the residence of Cindy Severance. Johnny Haskell Jr. was present at the time of the execution and was charged with aggravated trafficking in marijuana.

3. On February 9, 2005 your Affiant reviewed a report prepared by Detective Hooper from the Fairfield Police Department. This report stated, on January 21, 2005, Detective Hooper spoke with a subject from Clinton on an unrelated matter. At that time the name of Ricky Wilcox was discussed. Detective Hooper was told Ricky Wilcox dealt drugs and that he resided on Davis Street in Pittsfield. This subject went on to state that he/she had an employee that buys thirty to forty dollars of Marijuana off Wilcox daily and normally has a pound of marijuana in his (Wilcox) residence at any given time. When the Detective asked how he/she knew that, he/she stated that the employee told him. Detective Hooper also asked if Wilcox had any other types of drugs. She was told that Wilcox had oxy and was able to get cocaine. The subject stated Wilcox spent time in jail for Drug Trafficking, and has a wife and two children that reside at his residence. Detective Hooper was advised the employee did purchase marijuana from Wilcox last night January 20, 2005

---

[8]     I have relabeled the first six paragraphs of the affidavit alphabetically rather than numerically to avoid confusion between the first set of six paragraphs (pertaining to property subject to the search) and the second set of eight paragraphs (pertaining to facts and circumstances relied on to justify the search).

and there were three more unknown males at the Wilcox residence buying marijuana at the same time he was.

4. On January 22, 2005, Officer Minoty spoke with an eighteen year old female that was at the residence of Wilcox several times when drug and alcohol was being used. This female stated that the partying goes on any given night and that young females would go there for drugs and sex. This same female stated Wilcox kept marijuana, prescription drugs and sometimes cocaine in a filing cabinet in the basement w[h]ere they normally partied. When asked where Wilcox lived? The female stated at the corner of Davis Street and another street that she didn't know the name. Officer Minoty felt that the female was being truthful at the time the information was being offered. Minoty said that the female was t[ir]ed of Wilcox selling drugs and wanted something done about it.

5. On January 25, 2005, Trooper Chris Carr spoke with a citizen who is familiar with Ricky Wilcox and confirmed that his address is 19 Davis Street, that he has two children; he has spent time in federal prison for drug charges, now does drugs and deals in drugs.

6. On February 9, 2005, your Affiant conducted a Triple I check on Ricky Wilcox. Said check showed Wilcox being charged in 1994 in the State of Pennsylvania for Distribution of Marijuana and sentenced to six months in jail and three years of probation. Your Affiant also confirmed by town of Pittsfield records that Wilcox does indeed reside at 19 Davis Street.

7. On February 12, 2005, your Affiant observed Curtis Booth at the residence of Ricky Wilcox. Booth entered the residence of Wilcox and was, ten minutes then left. This happened two times within one hour. Curtis is a known drug abuser, is familiar by your Affiant and was present at another search warrant that was executed by your Affiant on June 2001 where Curtis was in possession of mushrooms. Wilcox was later seen by your Affiant leaving his residence.

8. This Search Warrant has been reviewed and approved by Assistant District Attorney James Mitchell.

Wilcox complains that the warrant affidavit does not bear a "particular description of the things to be seized" and anticipated a general, exploratory rummaging in Wilcox's belongings. (Mem. Opp'n Mot. Summ. J. at 12.) He further complains the affidavit relied on old news, an eleven-year-old criminal charge in Paragraph 6 and a four-year-old charge against Haskell in Paragraph 2 which is not relevant to Wilcox. (Id. at 14.) "Here," he opines, "the staleness of two of the paragraphs is compelling." (Id.)

24

Immediately after complaining of this staleness, Wilcox launches into a discussion of law pertaining to <u>false</u> statements in a warrant affidavit.  (<u>Id.</u>)  His argument goes that Paragraphs 1 and 3 of the affidavit relied on unnamed informants and that Officer Emery "failed to  speak to Officer Minoty or Detective Hooper to ascertain the veracity of the informant's assertions or their reliability."  (<u>Id.</u> at 14-15.)

Nowhere in the facts set forth above has Wilcox created a genuine dispute that would justify sending his Fourth Amendment claim apropos the search warrant affidavit to trial.  There is no dispute that in applying for the warrant, Officer Emery related all of the relevant information he had obtained in an affidavit in support of the application. In trying to contravene the defendants' position on probable cause, Wilcox relies heavily on his own conclusory statements.  He has not established that Wilcox made any deliberately false statements in the affidavit or that he was doing anything more than recounting information that had been given to him by others.

As the First Circuit recognized in <u>United States v. Meade</u>, 110 F.3d 190, 193-94 (1st Cir.1997), under the "fellow-officer" rule, law enforcement officials cooperating in an investigation are entitled to rely upon each other's knowledge of facts when forming the conclusion that a suspect has committed or is committing a crime. <u>See</u> <u>also</u> <u>United States v.</u> <u>Ventresca</u>, 380 U.S. 102, 111, (1965) ("Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number.").  What is more, in this case a justice of the peace issued a warrant for the search. In such a case, the reviewing court "essentially ignores the [searching] officer's knowledge; the officer need not know anything more than that a facially valid [search] warrant has issued. Rather, [the court] focus[es] entirely on the magistrate's knowledge to determine if the magistrate

25

had "a substantial basis for determining the existence of probable cause." <u>Wilson v. City of Boston</u>, 421 F.3d 45, 54 (1st Cir. 2005) (quoting <u>Gates</u>, 462 U.S. at 239).

### 2. *Fourteenth Amendment Defamation Claim*

<u>Paul v. Davis</u>, 424 U.S. 693, 699-700 (1976), relying on a plurality opinion in <u>Screws v. United States</u>, 325 U.S. 91 (1945), held that the Fourteenth Amendment was not intended to make all torts by state officials federally actionable (in that case under the criminal counterpart to § 1983  but only reached acts that deprived a person of federal Constitutional or statutory rights. As for defamation claims: "To begin with, interest in reputation as such is not a 'liberty' or 'property' concern which is guaranteed against spoliation by state action." <u>Pasdon v. City of Peabody</u>, 417 F.3d 225, 228 (1st Cir. 2005) (citing <u>Davis</u>, 424 U.S. at 708, 712).  A standard defamation  "allegation is not cognizable under the Constitution and thus fails to state an actionable cause under 42 U.S.C. § 1983." <u>Id.</u> (citing <u>Wojcik v. Mass. State Lottery Comm'n</u>, 300 F.3d 92, 102 (1st Cir.2002).  "For a reputational harm or stigma to be actionable under §1983, the utterance must be coupled with a loss of or adverse effect on a person's legal status." <u>Id.</u> at 29 (citing <u>Paul</u>, 424 U.S. at 707-09.) The test to determine if a defamation claim rises to the level of a constitutional violation has come to be known as the "defamation-plus" test.  <u>Celia v. O'Malley</u>, 918 F.2d 1017, 1021 (1st Cir.1990). As the Ninth Circuit has explained, a § 1983 claim for defamation-plus may be proved either by demonstrating that the plaintiff suffered an "injury to reputation that was <u>inflicted in connection</u> with the violation of a federally protected right" or by demonstrating that the plaintiff's "injury to reputation <u>caused the denial</u> of a federally protected right." <u>Herb Hallman Chevrolet, Inc. v. Nash-Holmes</u>, 169 F.3d 636, 645 (9th Cir.1999); <u>see also</u> <u>Aversa v. United States</u>, 99 F.3d 1200, 1216 n.15 (1st Cir. 1996); <u>Beitzell v. Jeffrey</u>, 643 F.2d 870, 878 & ns. 17&18 (1st Cir. 1981).

26

In his summary judgment opposition brief Wilcox maintains that "the liberty interest denied him was the ability to treat with a physician of his choice and to secure pharmaceutical products at the pharmacy of his choice." (Mem. Opp'n Summ. J. at 16.) His negligent infliction of emotional distress 'count' also includes the assertion that he lost his primary care physician for his pain management needs, had to "take a new pharmacy," and led to a divorce from his wife. (Id. at 17.) He attributes these injuries at least in part to the defamatory statements. (Id.) These 'losses' are not federally protected rights within the embrace of the Fourteenth Amendment and Paul.

Although initially in his brief Wilcox makes it clear that he is bringing his defamation claim as a 42 U.S.C. § 1983 claim, in his oppositional brief he does add an alternative to his defamation-plus approach by asserting that should that claim fail he would like to proceed under the Maine Tort Claim Act. (Mem. Opp'n Summ. J. at 16.)   The offending paragraphs of the newspaper article read: "A lengthy investigation into claims that a local man was providing teenage girls with illegal prescription drugs, then having sex with them, wrapped up this week with an arrest."; and, "Wilcox has not been charged with any sexual violations, Emery said, but he added that the case remains under investigation." (Docket No.16-5; see also Compl. ¶¶ 20-23.)[9]

The pertinent facts are as follows. Within a week after arresting Ricky Wilcox on February 19, 2005, Officer Emery was questioned by a reporter for the Bangor Daily News about Wilcox's arrest and the investigation of the charges against him. Officer Emery recited to the

---

[9]       These are the factual allegations that pertain to the defamation count.  Wilcox's memorandum in opposition to the motion for summary judgment as it relates to the defamation count is disorganized.  In his discussion of the defamation count he also talks about the absence of grounds for arrest, the limited quantity of marijuana and paraphernalia,  and the handcuffing.  (Mem. Opp'n Mot. Summ. J. at 16.)  Wilcox is represented by an attorney.  I do not think it is fair to allow him to play a shell game with the defendants and court vis-a-vis the legal grounds and factual basis for his claims.

reporter the statements he had made in the affidavit and application for a search warrant to respond to her questions concerning the nature of the activity which had led to Wilcox's arrest. Included in the information that Officer Emery related to the reporter was the report given to Officer Minoty by the 18-year-old female shown in the photographs that "young females would go there [the Wilcox residence] for drugs and sex."   According to the defendants, Officer Emery did not accuse Wilcox of having sex with these teenage girls, as he had no information about the specific sexual activity that had taken place at the parties at the Wilcox residence.

Wilcox agrees that the sentence in the article indicating that Ricky Wilcox was charged with personally having sex with teenage girls at his residence is not in quotation marks or otherwise represented to be a representation made to the reporter by Officer Emery and that Wilcox did not speak to the reporter to inquire as to what Officer Emery actually said.  Officer Emery had included in the search warrant all the information he had about sexual activity involving the teenage girls which was provided to him by Officer Minoty. While Officer Emery was aware, from a memo written by Officer Minoty, of allegations by one of the girls shown in the photographs that teenage girls went to the Wilcox residence for partying that included drugs and sex, however he had no more detailed information than that. The first sentence in the article merely reflects a misunderstanding by the reporter concerning the information that was in the affidavit supporting Officer Emery's request for a search warrant, and was not information supplied by Officer Emery. The defendants insist that Officer Emery had no information that Wilcox personally had sex with the teenage girls, nor did he ever advise anyone else that he had such information or accuse Wilcox of such sexual activity.

Quite simply, Wilcox has failed to generate a genuine dispute that Officer Emery is in any way responsible for the characterization in the first paragraph of the article or that the factual

assertion in the fourth paragraph of the article is false. See Withers v. Hackett, 1998 ME 164,

¶ 9, 714 A.2d 798, 801 (common law defamation factors); Loe v. Town of Thomaston, 600 A.2d

1090, 1092 -93 (Me. 1991) ("Defamation requires, as an essential element, the falsity of a

published statement."). Wilcox tries to place these facts in dispute my citing to affidavit

statements of Wilcox's ex-wife and Jessica Ames Almeida that attest to a conversation between

Emery and Diane Wilcox; however, it is far too great an inference to draw that he made similar

representations to the reporter who penned the story in question.  "Once the moving party avers

the absence of genuine issues of material fact, the nonmovant must show that a factual dispute

does exist, but summary judgment cannot be defeated by relying on improbable inferences,

conclusory allegations, or rank speculation."  Ingram v. Brink's, Inc., 414 F.3d 222, 228-29 (1st

Cir.2005); accord Mariasch v. The Gillette Co., __ F.3d __, __, 2008 WL 802671, *2 (1st Cir.

Mar. 27, 2008) ; Mariani-Colon, 511 F.3d at 224.

### 3. Excessive Force

I am skeptical of the need to even discuss the proposition that Wilcox still can maintain a

Fourth Amendment excessive force claim in light of the fact that he has utterly failed to defend

such a claim in his memorandum in opposition to the defendants' motion for summary judgment.

However, in a very clumsy fashion, he has attempted to put certain facts in dispute that pertain to

the use of excessive force.

"To establish a Fourth Amendment violation based on excessive force," the First Circuit

summarized in Jennings v. Jones,

> a plaintiff must show that the defendant officer employed force that was
> unreasonable under the circumstances. See Graham v. Connor, 490 U.S. 386, 397
> (1989). Whether the force used to effect a particular seizure is reasonable "must
> be judged from the perspective of a reasonable officer on the scene, rather than
> with the 20/20 vision of hindsight." Id. at 396. The reasonableness inquiry is

objective, to be determined "in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation."   Id. at 397. There must be "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396.

499 F.3d 2, 11 (1st Cir. 2007).

According to the defendants, Officer Emery checked the handcuffs after placing them on Wilcox, and double-locked them so they would not tighten further. During the transport to the jail, Wilcox indicated several times that he was going to sue Officer Emery for obtaining the search warrant for his residence. Once at the Somerset County Jail, Officer Emery was met by corrections officers who were to assume custody of Wilcox.  When Officer Emery opened the door for Wilcox to exit his cruiser, Wilcox asserts that Officer Emery had hurt his arm and that he did not want any help to exit the vehicle.  When they got inside the jail, Wilcox complained to the corrections officers about an injury to his right arm.  According to Officer Emery, Wilcox had not resisted arrest and Officer Emery was aware of no reason that Wilcox could claim to be injured.   There is no dispute that, because of jail policy, Wilcox had to be medically cleared before he could be incarcerated there:  he was x-rayed and medically cleared by the emergency room doctor to be returned to jail.

The real concern, vis-à-vis this summary judgment motion, is that Wilcox relays a very different version of events in his deposition testimony which is cited by Wilcox in his response to the defendants' statement of facts.  Wilcox has <u>not</u> made a sufficient effort to actually place the facts represented in the deposition testimony into the summary judgment record.  In his deposition Wilcox described a use of force by Officer Emery that he claims was excessive.  (R. Wilcox Dep. at 57-61.)  Furthermore, in his statement of additional fact Wilcox maintains that

when he confronted Officer Emery about his statements to his ex-wife, Defendant Emery became angry and placed Wilcox under arrest and that when Officer Emery placed the handcuffs on Wilcox they were "intentionally extremely tight."  He also maintains in his affidavit that Officer Emery yanked Wilcox, out of the patrol vehicle.  Of course, the defendants respond that Jason Emery did not get angry with Wilcox or arrest him without probable cause and maintain that Jason Emery put the handcuffs on Wilcox as he was trained to do, checking to see they were not too tight by placing two of his fingers inside them and double locking them so they would not tighten further.  The defendants deny that Officer Emery yanked Wilcox out of the cruiser and assert he did nothing intentionally to injure Wilcox.

Even if Wilcox had adequately defended his excessive force claim by placing facts material to the claim in the summary judgment record, the decisions in the First Circuit and the District of Maine that discuss handcuffing excessive force claims counsel that he does not have a factual basis to go forward to trial on this claim.  See Calvi v. Knox County, 470 F.3d 422, 428 (1st Cir. 2006)[10]; Pena-Borrero v. Estremeda, 365 F.3d 7, 12 (1st Cir. 2004); Bastien v. Goddard, 279 F.3d 10, 14 -15 (1st Cir.2002); Alexis v. McDonald's Rests. of Mass., 67 F.3d 341, 353 n.11 (1st Cir.1995); Judson v. Mount Desert Police, Civil No. 06-124-B-W, 2007 WL 2344969, 7  (D. Me. Aug. 10, 2007) (Kravchuk, Magis. J, recommended decision) aff'g 2007 WL 4268789 (D. Me. Nov. 30, 2007); Devine v. Rizzo, Civil No. 05-220-P-S, 2006 WL 1663853, 5 (D. Me. June 14, 2006) (Cohen, Magis. J, recommended decision) aff'g 2006 WL 1892440 (D. Me. July 6, 2006); Ray v. Donovan, Civil No. 05-239- P-H, 2006 WL 3741914, 18 -20 & ns. 32 & 33 (D. Me.  Dec. 14, 2006) (Kravchuk, Magis. J, recommended decision); see

---

[10]      See Calvi v. City of Rockland, Civil No. 05-11-P-S, 2006 WL 890687, 11 -12  (D. Me. Mar. 31, 2006) (Cohen, Magis. J, recommended decision) aff'g 2006 WL 1139924 (D. Me. Apr. 26, 2006)

also <u>Cortez v. McCauley</u>, 478 F.3d 1108, 1128 -29 (10th Cir. 2007) ("The only evidence in the record is his affidavit that the handcuffs left red marks that were visible for days afterward. … This is insufficient, as a matter of law, to support an excessive force claim if the use of handcuffs is otherwise justified."); <u>Glenn v. City of Tyler</u>, 242 F.3d 307, 314 (5th Cir. 2001) (Therefore, her sole contention is that the officer put the handcuffs on her too tightly, causing her right wrist to swell. This court finds that handcuffing too tightly, without more, does not amount to excessive force.").

### 4. *Supervisory Claims Apropos Chief Emery*

Chief Emery can be held liable as a supervisor "for the constitutional misconduct of [his subordinates] only on the basis of an 'affirmative link' between [his] acts and those of the offending employee." <u>Gaudreault v. Municipality of Salem</u>, 923 F.2d 203, 209 (1st Cir.1990) (quoting <u>Voutour v. Vitale</u>, 761 F.2d 812, 820 (1st Cir.1985)). That is he "can be held liable only on the basis of [his] own acts or omissions, amounting at the least to 'reckless' or 'callous' indifference to the constitutional rights of others." <u>Id.</u> (quoting <u>Gutierrez-Rodriguez v. Cartagena</u>, 882 F.2d 553, 562 (1st Cir.1989)).

The only subordinate that Wilcox 'fingers' is Officer Emery and Wilcox has failed to defeat Officer Emery's summary judgment showing that he is not responsible for any constitutional misconduct.  Furthermore, even if there was a demonstration of a constitutional violation on Officer Emery's part on the facts set forth above, it is beyond doubt that there is no factual support for a conclusion that Chief Emery was recklessly or callously indifferent to Wilcox's rights as Officer Emery's supervisor.

While Wilcox asserts that Officer Emery received no training in establishing probable cause to support an affidavit for a search warrant, the defendants counter that Jason Emery

testified that he had not had training in filling out an affidavit or a form for requesting a search warrant not that he had not had training in establishing probable cause to support a request for a warrant.

There is no dispute that Chief Emery is familiar with policies and procedures concerning arrest powers and the use of force in connection with arrests and the training given to Pittsfield police officers in these areas. At both the Maine Criminal Justice Academy and through in-house training at the Pittsfield Police Department, Officer Jason Emery received training on arrest powers, the lawful use of force in connection with arrests, and in the laws governing the application for, and execution of, search warrants. Prior to February 19, 2005, Chief Emery was not aware of any problems regarding Officer Emery's knowledge of Maine's laws governing arrest and/or the use of force. Prior to February 2005, Chief Emery had not received any credible information that Officer Emery unlawfully exercised his arrest powers or needlessly used force against arrestees, or that he required additional training and/or supervision in those areas. There also was no information indicating that there was any widespread problem involving other officers employed by the Pittsfield Police Department regarding the areas of arrest or the use of lawful force in connection with an arrest.   There is no basis for supervisory liability as against Chief Emery.

### 5.   *Municipal Liability of The Town of Pittsfield*

In a similar vein, with regard to the Town of Pittsfield's liability as a municipality "proper analysis requires" this court "to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation." Collins v. City of Harker Heights, 503 U.S. 115, 120 (1992) (emphasis added)(citing Oklahoma City v. Tuttle, 471 U.S. 808, 817

(1985) (opinion of Renquist, J.) and  id., at 828-829, 105 S.Ct., at 2438-2439 (opinion of

Brennan, J., concurring in part and concurring in judgment)); see also  Fletcher v. Town of

Clinton, 196 F.3d 41, 55 (1st Cir. 1999) ("Something more than liability on the part of the

individual defendants must be shown to impose liability on the municipality.").

Even if the Court ultimately determines that in spite of the defects in the summary

judgment record it has before it, Wilcox's claims against Officer Emery for excessive use of

force should be allowed to proceed, the record is devoid of evidence that would suggest a

municipal practice or custom of condoning or encouraging the excessive use of force by its

police officers.

### Conclusion

Based upon the foregoing I recommend the court grant the motion for summary

judgment.

### NOTICE

A party may file objections to those specified portions of a magistrate
judge's report or proposed findings or recommended decisions entered pursuant to
28 U.S.C. 636(b)(1)(B) for which de novo review by the district court is sought,
together with a supporting memorandum, and request for oral argument before the
district judge, if any is sought, within ten (10) days of being served with a copy
thereof.  A responsive memorandum and any request for oral argument before the
district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de
novo review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

April 30, 2008